NATIONAL HOME PRODUCTS CO., INC., Respondent, *v.* UNION CARBIDE AND CARBON CORPORATION, Appellant.

First Department, May 12, 1953.

*James A. Fowler, Jr.,* of counsel (*Asa D. Sokolow* with him on the brief; *Cahill, Gordon, Zachry & Reindel,* attorneys), for appellant.

*Robert O. Kleefeld* of counsel (*Richard H. Netter* with him on the brief; *Netter & Netter,* attorneys), for respondent.

CALLAHAN, J. The plaintiff buyer brings this action to recover damages for nondelivery of goods contracted to be sold by the defendant.

In September, 1947, the parties entered into three written contracts for the sale of chemicals by the defendant to the plaintiff. It was agreed that deliveries were to commence in the future, when the defendant seller had additional facilities available for manufacturing the chemicals. They were to continue for a period of five years after the defendant gave notice of its readiness to commence delivery.

The contracts provided that the seller would supply the " Buyer's total requirements, for use and consumption in Buyer's own plants, but not less than 60,000 pounds nor, except at Seller's option, more than 75,000 pounds per annum."

In 1947, when the contracts were executed, the plaintiff had three plants in operation for the manufacture of detergents. In 1950, when the defendant gave notice of its readiness to begin deliveries these plants had been sold or closed, and the plaintiff had ceased its manufacturing activities.

The defendant claims that in February, 1950, it mailed notice of its readiness to supply the chemicals. The plaintiff, however, denies that it ever received such notice. This factual dispute becomes immaterial in our view of the case. The plaintiff first demanded deliveries in the fall of 1950. Concededly, at that time the plaintiff had no plants in operation. While it claims to have had the financial ability to open new plants, the plaintiff does not assert that it was about to reactivate its manufacturing operations, nor has it shown an actual intention to resume manufacturing contingent on obtaining the chemicals.

The plaintiff simply insists that it had the legal right to give orders and require deliveries of the chemicals, though it had no plants, so as to protect its rights under the contracts; that it might buy or rent a plant or plants in the future; and that the seller was obligated to deliver in fulfilment of the plaintiff's orders, especially as the contracts stipulated for a minimum number of pounds per annum.

The defendant, on the other hand, claims that it was not required to deliver any chemicals, as the contracts were only intended to supply the requirements of a going business, and the plaintiff had ceased active operations and was not conducting such business at the time fixed for commencement of deliveries.

We agree with the defendant's position in this case. These contracts for delivery of the " total requirements, for use and consumption in Buyer's own plants " imply that the plaintiff must be in active manufacture and business in order to compel deliveries of the chemicals. The contracts in suit were essentially contracts for the plaintiff's operational needs during the year, and the defendant's promise to deliver the goods was conditional on the existence of plant needs of the buyer at the time of performance (*Nassau Supply Co.* v. *Ice Service Co.*, 252 N. Y. 277).

This fundamental feature was not altered by the specification of minimum and maximum quantities. The parties clearly contracted for a guaranteed minimum requirement of 60,000 pounds per annum and a maximum of 75,000 pounds per annum at the seller's option, if the buyer's actual requirements exceeded such quantity. In other words, the buyer simply undertook to guarantee that its requirements would be at least 60,000 pounds per annum, but the seller would not guarantee its readiness or ability to supply more than 75,000 pounds in any year. The contracts were not thereby transformed into agreements for specific or definite quantities of goods within minimum and maximum limits having no relation to the business exigencies of the buyer, as the plaintiff would seem to interpret them. They were still " requirements " contracts to meet the buyer's operational necessities as an active and functioning business in the manufacture of detergents. Unless so construed, the " requirements " provisions of the contracts would seem to be mere surplusage and meaningless.

While the Special Term held that there were issues of fact requiring trial in this case, we find no such triable issues as would affect the controlling question of construction. It is beside the point to argue, as does the plaintiff, that the contracts are valid and based on good consideration. The decisive question is whether the seller's promise of performance was absolute or conditional on actual plant needs of the buyer so as to relieve the seller of its obligation to deliver in the absence of such needs.

The order appealed from should be reversed, with $20 costs and disbursements to the appellant, and the defendant's motion for summary judgment dismissing the complaint should be granted.

PECK, P. J., and VAN VOORHIS, J., concur; COHN and BREITEL, JJ., dissent and vote to affirm.

Order reversed, with $20 costs and disbursements to the appellant, and the motion granted.